## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.  SARAH MELTON, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 1.  THE STATE OF OKLAHOMA | ) | Case No.:  <u>CIV-20-608-JD</u> |
| *ex rel*., THE UNIVERSITY OF OKLAHOMA; | ) | |
| 2.  DAVID ANNIS; | ) | |
| 3.  TRENT BROWN; | ) | |
| 4.  DAVID SURRATT; | ) | |
| 5.  KENNETH D. ROWE; | ) | |
| 6.  JAMES GALLOGLY, | ) | |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT

The Plaintiff, Sarah Melton, by and through her attorneys, Titus Hillis Reynolds Love, P.C., asserts the claims stated herein against the following Defendants: The University of Oklahoma, by and through its Board of Regents (the "University"), and David Annis, Trent Brown, James Gallogly, David Surratt, and Kenneth D. Rowe, and in support thereof, states as follows:

### THE PARTIES

1.     The Plaintiff is currently a domiciliary of Cypress, Texas, and was formerly enrolled as a freshman student at the University in the Fall of 2018.

2.     Defendant University is a public university in the State of Oklahoma.  Its principal campus is in Norman, Oklahoma.  Defendant University, by and through its

Board of Regents, operates and maintains the residential dormitories located at the University's campus in Norman.

3.     Defendant David Annis is the University's former Director of Housing and Food Services and is now domiciled in Lincoln, Nebraska.  At all relevant times, Defendant Annis, had direct operational responsibility for all aspects of the University's housing and food services.

4.     Defendant Trent Brown is the University's environmental safety officer and is domiciled in Norman, Oklahoma.  He had direct operational responsibility for environmental safety at the University.

5.     Defendant James Gallogly is the former president of the University and is currently domiciled in Colorado Springs, Colorado.

6.     Defendant David Surratt is the University's vice-president for Student Affairs and is domiciled in Norman, Oklahoma.  He had direct responsibility for Housing and Food Services and Resident Services at the University of Oklahoma.

7.     Defendant Kenneth D. Rowe is the University's Senior Vice-President and the chief financial officer for the University and is domiciled in Norman, Oklahoma.  He had direct responsibility for Facilities Management at the University of Oklahoma.

8.     The individual Defendants are sued in their individual, or alternatively, in their official capacities.

## SUBJECT MATTER JURISDICTION

9.     This Court has subject matter jurisdiction over this matter pursuant to the following statutes:

a.      28 U.S.C. §1332 governs subject matter jurisdiction based on diversity of citizenship.  There is diversity of citizenship between the Plaintiff and all Defendants, and the amount in controversy exceeds $75,000.

b.      28 U.S.C. §1331 governs actions that arise from the Defendant's claims arising from violations of the Fair Housing Act of 1968, 42. U.S.C. § 3601, *et seq*.  *See also* 28 U.S.C. §2201 and §2202.

c.      28 U.S.C. 1343(3) and (4), which gives District Courts jurisdiction over actions to secure civil rights extended by the United States Government.

## VENUE

10.     Venue is proper in this judicial district. At all relevant times, Defendants were conducting business in the State of Oklahoma, and the material acts and omissions alleged herein occurred in this judicial district.

## NOTICE OF INTENTION TO FILE TORT CLAIMS AGAINST THE STATE OF OKLAHOMA

11.     The Plaintiff timely served her notice of claim on the Office of the Risk Management Administrator on July 31, 2019, via certified mail and by hand-delivery on July 31, 2019, in compliance with 51 O.S. 156(B) of the Governmental Tort Claims Act. [The notice of claim is submitted herewith as Exhibit 1.]  Ensuing correspondence from the State of Oklahoma designated the effective date of the notice of claim to be August 23, 2019.  [*See* letter from Yolanda Dozal, Liability Adviser for the Risk Management Dept., Exhibit 2]

## SUMMARY OF THE CASE

12.   This is an action against the University of Oklahoma and current and former employees of the University, arising out of their intentional and egregious failure to remediate a known and dangerous condition in Walker Dormitory (the "Dormitory"). The Defendants, and each of them, were fully aware of extensive infestation of toxic mold in and around the Plaintiff's Dormitory room. Exposure to this toxic mold directly caused the Plaintiff's serious, and in some cases, life-long injuries.

13.   As a direct result of the Defendants' acts and omissions described herein, including their knowing decision to conceal information about the presence of toxic mold in the University's dormitories from students and parents – the Plaintiff was formally diagnosed with a litany of serious conditions, including but not limited to, the following:

    a.   Mycotoxin poisoning (mycotoxins are a poisonous substance produced by a fungus, and especial a mold);

    b.   Heavy metal poisoning (lead, tin, and antimony);

    c.   Funguses infecting the Plaintiff's gut;

    d.   Depressive disorder with depressive features;

    e.   Neurocognitive disorder (brain damage);

    f.   Anxiety disorder;

    g.   Knowledge deficit (brain damage);

    h.   Post-traumatic stress disorder;

    i.   Chronic inflammatory response syndrome.

**STATEMENT OF FACTS**

14.     As a freshman student at the University of Oklahoma, the Plaintiff was required by the University to live in one of the University's dormitories.  She requested to reside in Headington Hall; however, she was assigned to the Dormitory, Room 620E by the University.  She moved into her room on August 8, 2018.

15.     As a condition of University enrollment, Plaintiff was required to sign a Housing & Food Services Contract (the "Contract," submitted as Exhibit 3) setting forth the terms and conditions of the Plaintiff's occupancy of the Dormitory.  The Contract does not mention whether the Dormitory would be fit for human habitation, but the University's published policies make clear that the University's top priority "is our students' safety and health."  The University assured the Dormitory residents that it strived for a "welcoming and safe environment."  In addition, the orientation programs attended by the Plaintiff and her father emphasized safety for the students as the University's top priority.

16.     Notwithstanding these assurances, the Dormitory was, before and after the Plaintiff's enrollment at the University and occupancy of the Dormitory, contaminated by high levels of toxic mold.  The Defendants had long been aware of this ongoing and dangerous condition.  The Plaintiff was not.  The Defendants did not disclose to incoming freshman or other Dormitory occupants' information about the dangerous condition that existed within the Dormitory.

17.     A photograph and caption from the 1982 University Yearbook reflects substantial mold in one of the Dormitory bathrooms.  A July 19, 1995, article from the OU Daily newspaper discusses the presence of mold in the University dormitories.  Articles

5

from the October 2nd, 8th, and December 2, 2003, OU Daily newspapers discuss the presence of mold in the University dorms.  An article from the March 8, 2004, OU Daily newspaper notes, "[a] plague of problems" including mold in the University dormitories."

18.     November 14, 2004, there was a flood on the 6th floor of Dormitory caused by a fire sprinkler.  Several articles discuss consequential mold, including the "smell of mold," complaints that "I get sick to my stomach," etc.

19.     Parent notes on Facebook's "Boomer Sooner Parent Page" state that mold was an issue in the Dormitory in 2008.

20.     An August 20, 2008, OU Daily newspaper reflects that University Facilities Management denied that the air quality in the University dormitories was causing illness for freshmen living in these dormitories.

21.     Prior to Ms. Melton realizing what was causing her medical issues, a "Sooner Parents Group" on Facebook reflected extensive posts from many parents stating that they had gone to the University's housing department and director of housing during the academic year 2018-19 with concerns about mold.

22.     On September 20, 2018, Defendant Annis posted an ineffective, difficult to find notice on the OU Food and Housing website, in the residence halls' section. Defendant Annis' post spoke of the University's current challenges with mold and mildew in the University dormitories and asked students to call maintenance to have the mold "cleaned." This notice required any individual to search out the residence hall section of the housing and food website (which required four very specific clicks when looking directly from OU's webpage.)  Additionally, Defendant Annis' notice, failed to note any potential health

or safety issues related to mold in a student's dorm room.  The notice also failed to demonstrate urgency related to the University's mold problem or the long history of mold issues in the dormitories. This notice was not sent to students or parents of students living in the University dorms, despite the University having received multiple complaints of mold and illness related to these dormitories.

23.     During a meeting between the Plaintiff's mother and Defendant Annis on October 29, 2018, Defendant Annis stated in substance that the University was aware of the mold issue and that they had tested "a few" rooms for mold.

24.     On October 30, 2018, Assistant Provost Christ Walker stated in substance that he had met with students over the years who had claimed they were having issues with black mold.

25.     The presence of mold was visually confirmed by Defendant Brown October 29, 2018.  On the same date, the Plaintiff's mother inquired about moving Ms. Melton to another University dormitory.  Ms. Melton's former room was bleached by University personnel but not tested for the presence of molds, as  requested and agreed to during the in-person meeting between Ms. Melton's mother, Defendant Annis and Diane Brittingham (Director of Resident Services for the University).

26.     On November 4, 2018, the Plaintiff formally withdrew her enrollment from the University due to her many physical symptoms and an inability to mentally retain academic information.

27.     On October 30, 2018, Defendant Brown stated in substance both in an email to Defendant Annis and verbally during a telephone call to the Plaintiff and her mother that

he had on more than one occasion noted to Defendant Annis that the exhaust in the University dormitories was inadequate to prevent excessive moisture and toxic mold.

28.     On November 1, 2018, Defendant Annis said in substance during a meeting attended by several University executives as well as the Plaintiff and her parents that there were several other families that had complained of mold in the dorms over the years and that some of the families had performed their own mold testing and shared those results with the University.

29.     On November 1, 2018, Defendant Brown stated, during the same meeting noted above, in substance that he had performed over 250 air quality investigations over the years and had personally investigated eight dormitory rooms where mold existed during the 2018 academic year, but he could not speak to how many total rooms had been assessed for mold.

30.     Air quality tests performed on the Plaintiff's dorm room on November 2, 2018, by the University, at the insistence of the Plaintiff and her parents, demonstrated toxic mold counts in her suite more than 800 times higher than the counts outside, and in the common area on the sixth floor more than 7,000 times higher than outside. (All mold counts should be lower inside than outside.)

31.     On June 18, 2019, Eric Conrad (COO for the University) stated, in substance, that he was aware of the mold issues at the University during his recruitment.

32.     Defendant Annis, had direct operational responsibility for all aspects of housing and food services during Plaintiff's time at the University and for several years prior to her arrival.  Defendant Annis failed the students of the University both as the leader

8

responsible for housing and food services by failing to effectively respond to decades of complaints concerning toxic mold (and sickness related to mold) in the Dormitory. Defendant Annis failed to ensure that the University's dormitories, for which he was responsible, was in a state of repair that would meet basic habitability for the student population.   Additionally, Defendant Annis, failed to follow policies and procedures related but are not limited to proper maintenance and repair of the structures he was responsible for as well as policies related to mold remediation and proper cleaning techniques.   Defendant Annis repeatedly ignored the complaints of parents and students concerning the toxic conditions within the University dormitories and also ignored the advice of his environmental safety officer when advised concerning the effective options for remediating the toxic mold issues in these dormitories. Defendant Annis refused to proactively notify parents of incoming freshman students and/or the students themselves of the known health hazards related to mold in the freshman tower dormitories, Walker, Adams, and Couch Halls (hereinafter, the University dormitories.)

33.    Defendant Brown has direct operational responsibility for the environmental safety of the University.  He failed to follow state and federal guidelines in assuring the safety of the students within the University's dormitories.  He also failed to University's policies and federal guidelines in implementing mold remediation techniques. Defendant Brown failed to eliminate the toxic environment within the University's dormitories by installing adequate ventilation systems. Additionally, he intentionally and falsely represented to students and parents, including the Plaintiff, that the mold in the University dormitories were not toxic.  Finally, Defendant Brown intentionally failed to warn

9

occupants of the University dormitories, including the Plaintiff, regarding the health hazards associated with the mold that infected those dormitories.

34.     Defendant Gallogly, was responsible for ensuring that the University followed all established policies and procedures, and federal and state regulations addressing student safety.  He was further responsible for ensuring that the Board of Regents' agendas addressed issues affecting student safety.  Defendant Gallogly failed to proactively notify incoming students (including the Plaintiff) and parents of those students of the known health hazards associated with mold that existed in the University dormitories.  Defendant Gallogly failed to order the remediation of known toxic mold issues in the University dormitories.  In addition, he failed to warn freshman dormitory students and their parents that the mold existing in the University dormitories was toxic.

35.     Defendant Surratt has direct responsibility for Housing and Food Services and Resident Services at the University.  As the leader responsible for housing and food services, Defendant Surratt failed to effectively respond to decades of complaints concerning toxic mold (and sickness related to this mold) in the University dormitories. Defendant Surratt failed to ensure that the University's dormitories, for which he was responsible, were in a state of repair that would meet basic habitability for the student population.  Additionally, Defendant Surratt, failed to follow policies and procedures relating to proper maintenance and repair of the structures for which he was responsible. Moreover, he failed to follow policies and procedures relating to proper mold remediation. Defendant Surratt repeatedly ignored the complaints of parents and students concerning the toxic conditions within the University dormitories.  Defendant Surratt refused to

proactively notify parents of incoming freshman students and/or the students themselves, including the Plaintiff, of the known health hazards associated with the mold that existed in the University dormitories.  Defendant Surratt intentionally mislead students and their parents concerned about the toxic mold, representing that student illnesses were not related to the mold in the University dormitories despite years of evidence to the contrary.

36.    Defendant Rowe has direct responsibility for Facilities Management at the University.  Defendant Rowe failed to ensure proper maintenance and repair of the Dormitory.  Moreover, Defendant Rowe intentionally caused information to be released that was designed to mislead students, and parents of students, who had been complaining of illness or health concerns related to mold that existed in the University dormitories.  He also failed to assure that known toxic mold was promptly and properly remediated.  As chief financial officer, Defendant Rowe, has the responsibility to assure that funds are available to address and remediate the toxic mold existing in the University dormitories.

37.    On September 20, 2018, and after the Plaintiff first occupied the Dormitory, Defendant Annis posted a well-hidden and ineffective notice on the University Food and Housing website, in the residence halls' section.    Defendant Annis' notice spoke of the University's current challenges with mold and mildew in three University dormitories and asked students to call maintenance to have the mold "cleaned" where necessary.  Annis' notice failed to note any potential health or safety issues related to toxic mold.  The notice also failed to emphasize urgency relating to the mold infestation or the long history of the mold infestation in these dormitories.

38.   Plaintiff began feeling the early effects of toxic mold poisoning soon after she moved into the Dormitory.  *Less than a week after moving into the dormitory*, the Plaintiff's health began to deteriorate.  By August 14, 2018, the Plaintiff was already experiencing a stuffy nose, sore throat, and coughing.   These symptoms persisted throughout the remainder of August.   During the same month, the Plaintiff also experienced congestion, a red and itchy rash on her neck, headaches, hives on the back of her leg, poor appetite, knee pain with movement, a clogged right ear, and wheezing (for which she used an inhaler.)   These symptoms were surprising and distressing to the Plaintiff.  Prior to attending the University, she was in excellent health and a star member of her Frisco ISD high school's dance organization.

39.   The Plaintiff returned to her parents' home in McKinney, Texas, during the weekend of September 1, 2018.  With reprieve from the toxic exposure she had experienced in the Dormitory, the Plaintiff's symptoms began to subside.  However, the relief was short-lived.  After returning to the Dormitory, the Plaintiff not only suffered the full-blown return of her prior symptoms, she also experienced the loss of her voice, swelling in her right knee, and uncharacteristic moodiness.

40.   On September 13, 2018, the Plaintiff was unable to recall where her class was located.   She complained to her mother that she didn't feel like herself, was experiencing mood swings, and lacked motivation to attend class and prepare homework. She had trouble breathing on September 25, 2018, requiring the use of an inhaler.  She developed a rash on her legs, which progressively became worse.  The Plaintiff also noticed that she was uncharacteristically making spelling errors.   Her symptoms continued to

exacerbate, requiring her to leave a football game at the end of the month due to congestion, coughing, wheezing, sneezing, and losing her voice.  She lost consciousness and then vomited at a University football game.  A severe headache followed.  At this juncture, the Plaintiff still had no idea what the cause of her symptoms was.

41.     On September 20, 2018, the University's David Annis posted a public, but hidden, notice within the University's website admitting that the University had issues with mold and mildew and requesting that students call maintenance to have their rooms "cleaned."  Astonishingly, the University did not directly contact the Plaintiff (or likely, any other student resident) concerning the presence of mold, nor did the University inform students of the significant negative health impacts that could result from such a toxic mold exposure.

42.     Without knowledge of the Dormitory's toxic contamination, the Plaintiff continued to reside in the Dormitory, and her condition continued to deteriorate.  The Defendants did not disclose to incoming freshman or other Dormitory occupants information about the toxic and dangerous health threats that existed within the Dormitory. Moreover, the Defendants intentionally mislead the Plaintiff and her family, and other parents and students, when inquiries were made concerning illnesses experienced by students in the University dormitories.

43.     Examples of the University's suppression of the toxic mold infestation prior to and after the Plaintiff's enrollment include the following:

a.     Several policies, documents, and guides related to recruiting, orientation, and enrollment emphasized student safety as a priority.  In enrolling at the University and

13

accepting residence in the Dormitory, the Plaintiff and her family relied on these representations.

b.      Defendant Annis' September 20, 2018, notice on the OU Food and Housing website falsely represented that the University's current challenges with mold and mildew in the University towers were related to the higher than usual rain and humidity in the fall of 2018 and asked students to call maintenance to have the mold "cleaned". He did not mention that these dormitories had been infested with toxic mold for decades and that the infestation was not related to rainfall in any particular year. Defendant Annis' notice claimed that University officials found "some common surface mold and mildew," but did not mention that some of the mold species were toxic. Annis claimed "the majority of the issues" were found to be "linked to air handling units and filters." Defendant Annis failed to note the known issues related to the inadequate exhaust in the dormitories or associate the existing mold with any potential health or safety issues. Annis' notice again emphasized that, "our top priority is our students' safety and health." The notice also failed to demonstrate urgency related to these dangerous conditions.

c.      At a meeting held on October 29, 2018, between the Plaintiff's mother, Defendant Annis, and Diane Brittingham (Director of Resident Services for the University), the Plaintiff's mother requested that the Plaintiff's dorm room and bathroom be tested for mold. Defendant Annis and Ms. Brittingham agreed to conduct this testing.

d.      The presence of mold was visually confirmed by Defendant Brown shortly after the October 29, 2018, meeting.

e.     On October 30, 2018, during a meeting between the Plaintiff, her mother, and Associate Provost Chris Walker, Ms. Melton was told that the provost office and University had received complaints of black mold, but further investigation had always revealed that the mold had been mildew.

f.     On October 30, 2018, the Plaintiff and her mother arrived at the Plaintiff's dorm room and noticed that University personnel had used bleach on the walls.  During a November 1, 2018, meeting between the Plaintiff's family and Defendant Brown, Brown admitted that no testing of the Plaintiff's dorm room and bathroom had been conducted, and no remediation had been conducted in accordance with OSHA/EPA guidelines.

g.     On October 30, 2018, while still in the bleached dorm room, Ms. Melton and her mother had a conversation with Defendant Brown on the telephone.  At that time, Defendant Brown acknowledged that the bathroom in Walker 620E was observed by him and that it did have mold.  Ms. Melton's mother specifically asked if it was "black mold" and defendant Brown acknowledged that it was indeed black mold.

h.     The University failed to utilize proper cleaning techniques as admitted by Defendant Brown during the November 1, 2018 meeting between the University, Ms. Melton and her family.

i.     The University failed to perform preventative maintenance in conformance with the University's policies as admitted by Defendant Brown on October 29, 2018, and confirmed during a November 1, 2018, meeting between Brown and the Plaintiff's family.

k.     On November 2, 2018, at the insistence of the Plaintiff's parents to have mold testing performed, the University agreed to complete a "limited indoor air quality

assessment" on the Plaintiff's dorm room, the adjoining bathroom, and the 6E Common Area.  The results demonstrated toxic mold levels in several areas including Ms. Melton's room (700%+ higher in her room than outside for some toxic molds) and the common area (7000%+ higher than outside for some toxic molds).

l.      On November 4, 2018, the Plaintiff withdrew her enrollment as a student from the University as a direct result of her many physical symptoms and an inability to learn the academic curriculum.

m.      On November 27, 2018, the University advised that they had performed two air quality tests revealing "typical types of mold to which is naturally-occurring outdoors." University officials failed to mention that toxic molds are naturally occurring outdoors and are found indoors only in a water-damaged environment, which allows them to proliferate and exceed healthy levels and result in toxic exposures.  Statements by the University thus deceived parents and students who may have been concerned about the mold causing the students medical, cognitive, and psychological challenges.

n.      On December 14, 2018, Defendant Annis posted a letter to parents and students on the University's website.  He also emailed all students (and their parents) who were residing in the University dormitories.  This letter discussed air quality test results, noting that the indoor mold levels indoors were lower than outdoor mold levels.  The December 14 air quality tests, to the extent they were accurately reported, conflicted with the November 2 test results, demonstrating the University's ongoing intention to mislead students and their parents regarding the state of the air quality in the freshman dormitories.

16

o.     On January 15, 2019, the University sent a message to students asking them to "please forward to your parents." The message reported that, "[t]he levels of mold inside rooms is the same as it is outside; due to the unreasonable rain and humidity this region of the country is experiencing, those levels are higher than normal but not dangerously so." Again, the University failed to report the toxic mold detected in the Plaintiff's dormitory room and on the sixth floor.

p.     On January 16, 2019, Defendant Annis announced that he would retire from the University to take a similar position at the University of Nebraska.

46.    As a direct result of the University's intentional failure to properly remediate the toxic mold in the Dormitory over a period of decades, the Plaintiff suffered catastrophic, life-altering, and permanent physical, psychological, and cognitive damage. These symptoms include, but are not limited to:

a.     Severe anxiety and depression (ss formally diagnosed by her physician on October 15, 2018);

b.     Tremors of the hands and feet;

c.     Memory loss;

d.     Loss of attention span (rambling speech, unable to retain information, unable to concentrate in class);

e.     Cold and Sinus symptoms (Severe Sinusitis per PCP formal diagnosis, loss of voice, red eyes, congestions, chest tightness);

f.     Loss of appetite;

g.     Nausea;

h.     Loss of female menstrual cycle (diagnosed with hormonal dysfunction secondary to toxic mold exposure);

17

i.   Joint Pain and Swelling;

j.   Rashes;

k.   Migraines/ headaches;

l.      Severe fatigue;

m.      Light sensitivity;

n.      Fidgeting;

o.      Insomnia;

p.      Sore throat;

q.      Post-traumatic stress disorder;

r.      Syncope with vomiting;

s.      Dizziness;

t.      Cramping;

u.      Bloating;

v.      Hair loss;

w.      Personality changes;

x.      Social isolation;

y.      Visual disturbances;

z.      Heart palpitations;

aa.      High blood pressure;

bb.      Racing heart;

cc.      Brain fog;

dd.      Panic attacks.

44.   On November 7, 2018, the Plaintiff was diagnosed with mycotoxin poisoning (toxic mold poisoning) with a severity of 5/5.  She started on a mycotoxin protocol.  Her physician stated that she did not have the time to wait on the lab results to start the treatment.  The physician also ordered several tests to validate the diagnosis. The Plaintiff left her first specialty physician visit with orders for the following:

      A.  Blood Tests (21 vials of blood);
      B.  Urine Tests (6 urine tests);
      C.  47 medications/pills/powders/liquids per day;
      D.  Implementation of a ketogenic diet.

45.   In December 2018, the Plaintiff received the results of her initial lab tests. The results validated a diagnosis of severe mycotoxin poisoning as well as two fungal infections (Candida), hormonal dysfunction, and heavy metal poisoning (lead, tin, and antimony), all secondary to the toxic mold exposure while in the Dormitory. The lab results sent the Plaintiff into a panic attack requiring her to utilize her inhaler in the middle of the appointment.  Additionally, these results required the following additions to her already overwhelming medical regimen:

      A.  Approximately ten additional pills per day;

      B.  Intravenous chelation twice per week for ten weeks for heavy metal poisoning.

46.   In January 2019, at the request of her specialist, the Plaintiff submitted to an extensive, evidence-based, neuropsychological assessment to determine her neurocognitive and personality/behavioral status.  She scored in a low-normal range, bilaterally, on a measure of the motor speed of the index finger.  Grip strength was mildly

impaired with her non-dominant left hand.  She scored in a mildly to moderately impaired range on a measure of manual speed and dexterity, bilaterally, consistent with her report of diminished hand-eye coordination.  Greater impairment was observed on the motor tests. Scores fell in a mildly to moderately impaired range, bilaterally, on a measure of manual speed and dexterity.

47.  According to the neuropsychological assessment, the Plaintiff's reading may have been diminished to some degree subsequent to her toxic exposure as she was quite proficient in reading during her public school training.  Recent scores likely indicated a decline in general intellectual functioning considering prior academic achievements, which suggested high-average to superior abilities.

48.  Scores on various measures of memory (verbal and nonverbal incidental memory, logical verbal memory, list-learning, word pairs, and visuospatial memory and visual motor response) fall within normal limits.  However, the majority of scores fall in the average range and are inconsistent with prior academic achievements and reported memory functioning, suggesting a decline.  The Plaintiff scored in a mildly to moderately impaired range on a complex psychomotor problem-solving task, which requires an ability to sustain adequate strength and speed of movement in the upper extremities and tactile perception in addition to problem solving.  Her score suggests that she would have some difficulty with new or unique problem-solving situations.  This particular measure has been found to be the most sensitive to dysfunction in toxically-exposed individuals.

49.  The neuropsychological examiner concluded that the Plaintiff's level of comfort, satisfaction, achievement, and effectiveness had clearly been diminished

20

subsequent to her toxic exposure.  She was diagnosed with mild neurocognitive disorder, depressive disorder with depressive features, and anxiety disorder, all attributable to her mycotoxin exposure while residing in the Dormitory.

50.     Over the past eighteen months, Ms. Melton has endured treatments, medications, drastic diet changes, significant lifestyle changes, and a major disruption to her college experience, her future plans, and her young adult life.

51.     The Plaintiff continues to struggle physically, mentally, socially, and academically.  All of these adverse results and symptoms were due to the Defendants' intentional and wrongful conduct.

52.     Since the time that the Plaintiff first realized that her deteriorating health conditions were directly caused by preventable exposure to toxic mold, she and her parents met with University administration members to express their concerns and to assure the safety of other students living in the Dormitory.  However, to the Plaintiff's knowledge, no meaningful steps have been taken to remediate the existing toxic mold, ensure the safety of Dormitory residents, or even meaningfully inform University students of the serious health risks posed by residing in University dormitories.  The University continues to require freshmen students to live in its dormitories but refuses to advise them of the harmful conditions that exist.  Indeed, students and their families are forbidden from discussing dormitory mold conditions in University internet chat rooms.

## FIRST CLAIM FOR RELIEF
### (Breach of Written Contract and the Implied Warranty of Habitability against the University Only)

53.    Plaintiff hereby incorporates paragraphs 1 through 52 by reference and request that they be made a part hereof.

54.    The existence of persistent mold growth in the Dormitory, the Defendants' refusal to effectively remediate the mold, and the Defendants' communications about the condition of the Dormitory, have injured the health and property of the Plaintiff.

55.    Under the facts alleged herein, an implied warranty of habitability protected the Plaintiff against injury.  The University breached this implied warranty by allowing toxic mold conditions to persist in the Dormitory during the Plaintiff's occupancy thereof, and indeed, for a period of decades.  The University did not take steps to notify the Plaintiff, or other Dormitory residents, of the dangerous toxic conditions and the threat to their health and property.  Moreover, the Defendants engaged in a conspiracy to cover up the existence of elevated levels of toxic mold.

**WHEREFORE,** the Plaintiff, in the amount of $5,000,000.00, plus the costs of this suit, an award of reasonable attorneys' fees, for appropriate remediation of the Dormitory, and for such other and further relief as this Court deems just.

## SECOND CLAIM FOR RELIEF
### (Fraud in the inducement and constructive fraud against the individual Defendants only)

56.    Plaintiff hereby incorporates paragraphs 1 through 55 by reference and requests that they be made a part hereof.

57.     The Plaintiff was required by the University and the individual Defendants to live in the Dormitory.  She was repeatedly assured by the University that it prioritized student safety on campus above all else.  The Plaintiff therefore received the blessings of her parents to enroll at the University.   However, as detailed herein, the individual Defendants were fully aware that the occupancy of the Dormitory was unsafe for its students due to mold infestation, and they failed to effectively disclose this fact to the Plaintiff and other students in the Dormitory.  Moreover, the Defendants failed to disclose the known dangers associated with exposure to mold, suppressed the dissemination of information about the existing dangerous conditions and risks associated therewith, and failed to effectively remediate the moldy conditions.  The Plaintiff was unaware of the dangerous conditions existing in the Dormitory, and her continuous exposure to mold in the Dormitory resulted in the injuries described herein.  She reasonably relied on the individual Defendants' representations and that Defendants would not conceal material facts.

58.     Defendants had a legal and/or equitable duty to disclose the dangerous conditions that existed in the Dormitory and the potential adverse health consequences of living in these conditions.  Defendants' conduct constitutes actual and constructive fraud for which the individual Defendants are liable to the Plaintiff.

59.     As a direct result of the failure of the individual Defendants to disclose the dangerous conditions existing at the Dormitory, the Plaintiff was grievously injured, suffering all of the mental and physical injuries described in this complaint.

**WHEREFORE,** the Plaintiff requests an award of compensatory damages against the individual Defendants in the amount of $5,000,000.00, punitive damages in the amount of $15,000,000, plus the costs of this suit, and for such other and further relief as this Court deems reasonable and appropriate.

### THIRD CLAIM FOR RELIEF
**(Violation of the Fair Housing Act against all Defendants)**

60.     The Plaintiff hereby incorporate paragraphs 1 through 59 by reference and requests that they be made a part hereof.

61.     Plaintiff sues the Defendants for injunctive relief, compensatory and punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3601, *et seq*.  This action is brought by the Plaintiff against the Defendants.

62.     The Plaintiff is a "handicapped person" and an "aggrieved person" as those terms are defined in 42 U.S.C.A. § 3602.   She was injured by the University's discriminatory housing practice and was forced to leave the University and abandon her plans to obtain an education there.

63.     Due to the Defendants' repeated assurances of a safe environment in which to live, the Plaintiff and her parents expected a safe and habitable environment in the Dormitory.  Upon learning that the environment in the Dormitory was not safe and that their daughter had been grievously injured by the long-existing and dangerous conditions described herein, the Plaintiff's parents met with University officials and requested professional remediation of the elevated levels of toxic mold as a reasonable

accommodation of the Plaintiff's obvious sensitivity to toxic mold.  However, University officials declined to undertake the requested remediation.

64.    The Defendants acted with discriminatory intent, but even if a jury finds that their intent was benign, which the Plaintiff disputes, the discriminatory effect was to eliminate disabled persons with the same handicap and susceptibility to toxic mold as was suffered by the Plaintiff.

65.    In order to avoid the further decimation of her health, the Plaintiff was forced to withdraw from the University and abandon the Dormitory.  Leaving the University caused the Plaintiff to incur damages, including moving expenses and re-enrollment expenses.  In addition, she suffered humiliation, embarrassment, emotional distress, harm to her dignity, and other harm to the Plaintiff's personality as a result of her return to her parents' home and the termination of her undergraduate educational plans.  Finally, she suffered harm due to the violation of her rights as a handicapped person.

66.    The Plaintiff's legal remedy is not adequate, and she is entitled to injunctive relief to prevent the University from persisting in their refusal to provide a reasonable accommodation to the Plaintiff and students who have similar disabilities.

**WHEREFORE,** as a result of the Defendants' intentional and/or reckless violation of the Fair Housing Act, the Plaintiff requests an award of compensatory damages in the amount of $1,000,000, punitive damages in the amount of $5,000,000), or in such other amount as will deter the University from engaging in similar conduct in the future, an award of recoverable costs, an award of reasonable attorneys' fees, an award of expert witness expenses, for injunctive relief, including the discontinuation of the discriminatory housing

practices that prevail at the University's Dormitory, and for such other and further relief as this Court deems just.

**FOURTH CLAIM FOR RELIEF**
**(Intentional Infliction of Emotional Distress against all Individual Defendants)**

67.     The Plaintiff incorporates paragraphs 1 through 66, inclusive, by reference and requests that they be made a part hereof.

68.     The individual Defendants, and each of them, knew of the dangerous conditions that previously and currently exist at the Dormitory.  The Dormitory is not safe for human habitation for many of the students who occupy the building every school year. The individual Defendants do not know who will be injured, but they know that some students will be adversely affected every year.  The individual Defendants have permitted this condition to exist since at least the 1980s and probably longer, and as the individual Defendants took positions of responsibility with the University, they conspired to allow these dangerous conditions to persist.

69.     The uninhabitable conditions that existed at the Dormitory caused grievous injuries to the Plaintiff, as described herein, including severe emotional distress that has been diagnosed as post-traumatic stress syndrome.  The Plaintiff suffers panic attacks, social withdrawal, severe anxiety, depression, emotional distress, embarrassment, humiliation, and other injuries to her personality to this day.  She did not experience any of these symptoms prior to her occupancy of the Dormitory.

70.     The Plaintiff has incurred compensatory damages that include medical and medically-related expenses.  Leaving the University caused the Plaintiff to incur other damages, including moving expenses and re-enrollment expenses.

**WHEREFORE,** as a result of the individual Defendants intentional infliction of the Plaintiff's emotional distress, the Plaintiff requests an award of compensatory damages in the amount of $5,000,000 in compensatory damages against the individual Defendants. The Plaintiff also requests an award of punitive damages against the individual Defendants in the amount of $15,000,000, or in such other amount deter them from engaging in similar conduct in the future.  The Plaintiff also requests an award of recoverable costs and post-judgment interest, and such other and further relief as the Court deems just.

**FIFTH CLAIM FOR RELIEF**
**(Public Nuisance against all Defendants)**

71.     The Plaintiff incorporates paragraphs 1 through 70, inclusive, by reference and requests that they be made a part hereof.

72.     Defendants, individually and acting through their employees and agents, in concert with each other, have intentionally and/or recklessly engaged in conduct  or omissions which endanger the property, health, safety, and/or conform of a considerable number of persons in Oklahoma.

73.     Plaintiff brings this claim for relief against all Defendants pursuant to 50 O.S. § 2 on the ground that they have created a public nuisance that affects at the same time the community that inhabits the Dormitory.

74.     The toxic conditions that pervade the Dormitory pose a substantial and sinister health risk to the students who occupy the living units in that building.  The public nuisance created and proliferated by the Defendants was especially injurious to the Plaintiff and caused her personal and emotional injuries, as detailed herein.

75.     As a result of the public nuisance that has been created and proliferated by the Defendants, the Plaintiff seeks damages and abatement.  Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating a nuisance and causing the harms and damages alleged herein.

76.     The Plaintiff has suffered the damages previously described herein and seeks abatement through an order of this Court.

77.     The conditions that resulted in the public nuisance described herein were known to, and intentionally and maliciously proliferated by, the Defendants.

**WHEREFORE,** as a result of the Defendants' intentional proliferation of a public nuisance, the Plaintiff requests an award of compensatory damages in the amount of $5,000,000 in compensatory damages against all Defendants, and an award of punitive damages against the individual Defendants in the amount of $15,000,000, or in such other amount as will deter them from engaging in similar conduct in the future.  The Plaintiff also requests an award of recoverable costs and post-judgment interest and such other and further relief as the Court deems just.

## SIXTH CLAIM FOR RELIEF
### (Private Nuisance against all Defendants)

78.     The Plaintiff incorporates paragraphs 1 through 77, inclusive, by reference and requests that they be made a part hereof.

79.     Plaintiff brings this claim for relief against all Defendants pursuant to 50 O.S. § 3 on the ground that they have created a private nuisance that affects the Plaintiff.

80.     The toxic conditions that pervade the Dormitory posed a substantial and sinister health risk to the Plaintiff.  The public nuisance created and proliferated by the Defendants was injurious to the Plaintiff and caused her personal and emotional injuries, as detailed herein.

81.     As a result of the public nuisance that has been created and proliferated by the Defendants, the Plaintiff seeks damages and abatement.

82.     The Plaintiff has suffered the damages previously described herein and seeks abatement through an order of this Court.

83.     The conditions that resulted in the public nuisance described herein were known to, and intentionally proliferated by the Defendants.

**WHEREFORE,** as a result of the Defendants' proliferation of a public nuisance, the Plaintiff requests an award of compensatory damages in the amount of $5,000,000 in compensatory damages against all Defendants, and an award of punitive damages against the individual Defendants in the amount of $15,000,000, or in such other amount as will deter them from engaging in similar conduct in the future.  The Plaintiff also requests an award of recoverable costs and post-judgment interest.

## SEVENTH CLAIM FOR RELIEF
### (Intentional Interference with Contract against all individual Defendants)

84.     The Plaintiff incorporates paragraphs 1 through 83, inclusive, by reference and requests that they be made a part hereof.

85.     The Plaintiff had a contractual relationship with the University in 2018.  The individual Defendants were aware of that contractual relationship.   Nevertheless, the individual Defendants intentionally caused the University to breach its contractual relationship with the Plaintiff by allowing dangerous toxic mold conditions to exist in the Dormitory.

86.     As demonstrated herein, the contractual relationship was breached by the University due to the intentional acts and omissions of the individual Defendants resulting in the Plaintiff necessarily cancelling her enrollment at the University due to health reasons.

**WHEREFORE,** as a result of the Defendants' intentional interference with the Plaintiff's contract with the University, the Plaintiff requests an award of compensatory damages in the amount of $5,000,000 against all Defendants, and an award of punitive damages against the individual Defendants in the amount of $15,000,000, or in such other amount as will deter them from engaging in similar conduct in the future.  The Plaintiff also requests an award of recoverable costs and post-judgment interest.

## EIGHTH  CLAIM FOR RELIEF
### (Negligence and negligent representation against the University inuring through the acts and omissions of the individual Defendants acting in their official capacities)

87.     The Plaintiff incorporates paragraphs 1 through 86, inclusive, by reference and requests that they be made a part hereof.

88.     The individual Defendants, acting in their official capacities, were negligent in allowing the aforementioned toxic mold conditions to persist in the Dormitory.  They were also negligent in failing to disclose to the Plaintiff and other Dormitory occupants the existence of this dangerous condition.  The negligent acts and omissions of the individual Defendants, and each of them, acting in their official capacities, has injured the health of the Plaintiff in the manners and ways described herein.

**WHEREFORE,** as a result of the Defendants' negligent acts and omissions, the Plaintiff requests an award of compensatory damages in the amount of $175,000 against the University.  The Plaintiff also requests an award of recoverable costs and post-judgment interest and such other and further relief as the Court deems just.

## NINTH CLAIM FOR RELIEF
### (Claim for Declaratory Judgment against the University only)

89.     The Plaintiff incorporates paragraphs 1 through 88, inclusive, by reference and requests that they be made a part hereof.

90.     The Plaintiff seeks a declaratory judgment, pursuant to 12 O.S. § 1651, *et seq.*, to provide a declaration of her rights, status, and/or other legal relations under her contract with the University for residence in the Dormitory, as well as under all applicable State and local laws, statutes, and regulations that govern the nature of residential dwellings provided by the University to the Plaintiff.  Specifically, the Plaintiff seeks a declaration that the University is legally required to provide a safe, clean, and habitable residence for the Plaintiff and other current and incoming students, and that the University is obligated

to remedy any harm or injury caused by its failure to provide such a safe, clean, and habitable residence, including any such harm or injury caused by mold in the Dormitory.

91.    The Plaintiff further seeks a declaration that the University is required to remediate mold at its dormitories in accordance with industry standards and in a manner that effectively and comprehensively eliminates the danger to the Plaintiff and other current and future students posed by that mold.

**WHEREFORE**, the Plaintiff and all individuals similarly situated, pray for a declaratory judgment against the University and in favor of the Plaintiff for appropriate injunctive and/or declaratory relief, and for all other relief that is just and proper.

Respectfully submitted,

s/ James M. Love
James M. Love, OBA #10580
TITUS, HILLIS, REYNOLDS, LOVE, P.C.
15 East Fifth Street, Suite 3700
Tulsa, Oklahoma  74103-4334
(918) 587-6800; (918) 587-6822 (fax)
*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Except where equitable relief is sought, the Plaintiff hereby demands a jury trial in connection each and every claim for relief in this Complaint.

s/ James M. Love
James M. Love

ATTORNEY'S LIEN CLAIMED

32