## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

SARAH MELTON,                          )
                                              )
      **Plaintiff,**                 )
                                              )
v.                                     )     **Case No. CIV-20-608-G**
                                              )
STATE OF OKLAHOMA ex rel.              )
THE UNIVERSITY OF OKLAHOMA             )
et al.,                                )
                                              )
      **Defendants.**                )

## ORDER

Now before the Court are the Motions to Dismiss of Defendants David Annis, Trent Brown, David Surratt, Kenneth D. Rowe, and James Gallogly (the "Individual Defendants") (Doc. No. 8) and the State of Oklahoma *ex rel.* University of Oklahoma (the "University") (Doc. No. 10). Plaintiff Sarah Melton has responded in opposition (Doc. Nos. 26, 30). Defendants have replied (Doc. Nos. 34, 35).

SUMMARY OF THE PLEADINGS

In her Complaint (Doc. No. 1), Plaintiff alleges the following facts relevant to disposition of the Individual Defendants' and the University's Motions.

In the Fall of 2018, Plaintiff enrolled as a freshman student at the University. Compl. ¶ 1. She moved into her assigned room on the sixth floor of the Walker Dormitory on August 8, 2018. *Id.* ¶¶ 12, 14. Plaintiff's health began to deteriorate within the week, which Plaintiff alleges was the result of a toxic mold infestation in the dormitory. *Id.* ¶ 38. Plaintiff experienced a stuffy nose, sore throat, coughing, congestion, rash, hives, headaches, poor appetite, knee pain, wheezing, and a clogged right ear. *Id.* Plaintiff's

symptoms became progressively worse in September, including an episode in which she could not recall where her class was located and an episode in which she lost consciousness and then vomited.  *Id.* ¶¶ 39-40.

University personnel bleached the walls of Plaintiff's dorm room on or around October 30, 2018.  *Id.* ¶¶ 25, 43(f).  Air quality tests performed on November 2, 2018, demonstrated toxic mold counts in Plaintiff's suite greater than 800 times that of outside and toxic mold counts in the common area of the sixth floor greater than 7000 times that of outside.  *Id.* ¶ 30.  Plaintiff ultimately withdrew from the University on November 4, 2018, due to her symptoms.  *Id.* ¶ 26.  *But see* Notice of Claim (Doc. No. 1-1) at 3 (identifying November 1, 2018, as date of withdrawal); Pl.'s Resp. to Univ.'s Mot. (Doc. No. 26) at 31 n.7 (same).

In November and December of 2018, Plaintiff was diagnosed with severe mycotoxin poisoning, heavy metal poisoning, fungi infecting Plaintiff's gut, depressive disorder with depressive features, neurocognitive disorder, anxiety disorder, knowledge deficit, post-traumatic stress disorder, and chronic inflammatory response syndrome. Compl. ¶¶ 13, 44, 45.[1]  Plaintiff alleges that the University and Individual Defendants were

---

[1] Plaintiff additionally alleges physical, psychological, and cognitive damage in the form of severe anxiety and depression, tremors of the hands and feet, memory loss, loss of attention span, cold and sinus symptoms, loss of appetite, nausea, loss of female menstrual cycle, joint pain and swelling, rashes, migraines, severe fatigue, light sensitivity, fidgeting, insomnia, sore throat, syncope with vomiting, dizziness, cramping, bloating, hair loss, personality changes, social isolation, visual disturbances, heart palpitations, high blood pressure, racing heart, brain fog, and panic attacks.  Compl. ¶ 46.

aware of the mold infestation but suppressed the dissemination of information regarding its existence and risks and intentionally failed to remediate it. *Id.* ¶ 57.

Plaintiff asserts claims of fraud in the inducement, constructive fraud, intentional infliction of emotional distress, and intentional interference with contract against the Individual Defendants. Plaintiff asserts claims of breach of contract, breach of the implied warranty of habitability, negligence, negligent representation, and declaratory judgment against the University. Plaintiff additionally brings claims of public and private nuisance and violation of the Fair Housing Act of 1968, 42 U.S.C. §§ 3601 et seq., against all Defendants.

DISCUSSION

I.    *Claims Against the University*

The University moves for dismissal of Plaintiff's claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure based on Eleventh Amendment immunity. Pursuant to the doctrine of sovereign immunity, as adopted in the Eleventh Amendment, "nonconsenting States may not be sued by private individuals in federal court" unless the states "consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001); *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 (10th Cir. 2010) (internal quotation marks omitted). The University "is an arm of the state for purposes of the Eleventh Amendment, entitled to invoke Eleventh Amendment immunity." *Quinn v. Univ. of Okla.*, No. CIV-05-396-R, 2005 WL 8157831, at *1 (W.D. Okla. July 6, 2005). The University asserts that Plaintiff,

3

who bears "the burden of alleging the facts essential to show jurisdiction," has failed to allege facts to support an exception to sovereign immunity in this matter. *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 797 (10th Cir. 2002) (internal quotation marks omitted).

"Oklahoma has not waived its immunity" from suit in federal court. *Hensel v. Office of the Chief Admin. Hearing Officer*, 38 F.3d 505, 508 (10th Cir. 1994) (citing Okla. Stat. tit. 51, § 152.1(B)). Despite this lack of a general waiver, however, Plaintiff objects that the University has waived its immunity to the instant lawsuit by nature of its receipt of federal financial assistance for the purpose of urban renewal. *See* Pl.'s Resp. to Univ.'s Mot. at 6-13. Specifically, Plaintiff points to the Rehabilitation Act's waiver provision, 42 U.S.C. § 2000d-7(a)(1), which provides:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7(a)(1).

As noted, Plaintiff's Complaint alleges that the University violated the Fair Housing Act of 1968 ("FHA"). Courts have consistently concluded that Congress did not abrogate state sovereign immunity through enactment of the FHA. *See, e.g.*, *Gregory v. S.C. Dep't of Transp.*, 289 F. Supp. 2d 721, 724-25 (D.S.C. 2003). Plaintiff contends, however, that the FHA constitutes a "Federal statute prohibiting discrimination by recipients of Federal financial assistance" as contemplated by the residual clause of the Rehabilitation Act's

waiver provision quoted above.  42 U.S.C. § 2000d-7(a)(1).  In support, Plaintiff asserts that the FHA prohibits, among other acts, "discrimination in the sale or rental of housing" where the dwelling is "provided by the development or the redevelopment of real property purchased, rented, or otherwise obtained from a State or local public agency receiving Federal financial assistance for slum clearance or urban renewal with respect to such real property under loan or grant contracts."  42 U.S.C. § 3603(a)(1)(D).  Plaintiff attached to her Response auditor reports and financial statements for the Oklahoma City Urban Renewal Authority and asks the Court to take judicial notice of these documents as evidence of the State's receipt of Federal financial assistance for urban renewal.  *See* Pl.'s Resp. to Univ.'s Mot. at 7; *id.* Ex. 1 (Doc. No. 26-1).

"[O]nce effectively asserted, [Eleventh Amendment] immunity constitutes a bar to the exercise of federal subject matter jurisdiction."  *Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 559 (10th Cir. 2000) (emphasis omitted); *see also Hensel*, 38 F.3d at 508.  A Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction takes one of two forms: a facial attack or a factual attack.  *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015).  A facial attack questions the sufficiency of the allegations of subject-matter jurisdiction contained in the complaint.  In reviewing a facial attack, a district court confines its analysis to the pleadings and must accept the allegations in the complaint as true.  *Id.*  A factual attack, however, "go[es] beyond allegations" in the complaint and "challenge[s] the facts upon which subject matter jurisdiction depends."  *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).  Though Plaintiff raises a factual question beyond the scope of the complaint—i.e., whether the State accepted federal funds for urban

renewal—the answer to this factual issue is irrelevant to the question of subject-matter jurisdiction in this matter because the Court determines that the residual clause of the Rehabilitation Act's waiver provision does not encompass the FHA. Thus, the Court need not go beyond the allegations of the Complaint.

According to Plaintiff, by enacting 42 U.S.C. § 2000d-7(a)(1) Congress has conditioned the receipt of federal financial assistance such as that received by the University upon the recipient's waiver of its Eleventh Amendment immunity to FHA claims. The Tenth Circuit considered a similar question in *Levy v. Kansas Department of Social & Rehabilitation Services*, 789 F.3d 1164 (10th Cir. 2015). There, the plaintiff argued that a state agency had waived its sovereign immunity on his claim under the Americans with Disabilities Act ("ADA") by accepting federal funds. *See id.* at 1169. The Tenth Circuit analyzed whether the ADA "falls into the residual clause of the Rehabilitation Act's waiver [of sovereign immunity] for violations of 'the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.'" *Levy*, 789 F.3d at 1170 (quoting 42 U.S.C. § 2000d-7(a)(1)). Answering that it did not, the Tenth Circuit observed that "the ADA has a much broader focus than discrimination by recipients of federal financial assistance" and that "no court has concluded that the Rehabilitation Act's waiver provisions apply to the ADA." *Id.* at 1171. Further, the Court noted that "Congress could have included a similar waiver provision in the ADA or added the ADA to the list of nondiscrimination statutes in the Rehabilitation Act's waiver provisions, but it did not." *Id.* The Court concluded that, "[i]n the absence of clear evidence that Congress intended for states to waive their immunity under the ADA

by accepting federal funds, we will not stretch the language of the Rehabilitation Act to conclude that [the defendant] has made a clear and voluntary waiver of its sovereign immunity for ADA claims." *Id.* (footnote omitted).

The considerations articulated in *Levy* apply equally to Plaintiff's FHA claim. Congress could have expressly abrogated sovereign immunity in the FHA, but it did not. Congress could have expressly included the FHA in the list of nondiscrimination statutes delineated in the Rehabilitation Act's waiver provisions, but it did not. And, like the ADA, the FHA's focus goes well beyond discrimination by recipients of federal financial assistance. *See Morgan v. Sec'y of Hous. & Urb. Dev.*, 985 F.2d 1451, 1455 (10th Cir. 1993) ("Application of the Fair Housing Act after December 31, 1968, . . . does not turn on the presence or absence of federal financing." (citing 42 U.S.C. § 3603(a)); *see also Sossamon v. Texas*, 563 U.S. 277, 292 (2011) ("[G]eneral words, such as the residual clause [of § 2000d-7(a)(1)], are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (internal quotation marks omitted)). Plaintiff does not cite, and the Court has not found, any decisional law "conclud[ing] that the Rehabilitation Act's waiver provisions apply to" the FHA. *Levy*, 789 F.3d at 1171.[2]

"In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated by the most express language

---

[2] Plaintiff cites multiple cases in support of the proposition that section 2000d-7(a)(1) "validly conditions receipt of federal funds on a waiver of sovereign immunity." Pl.'s Resp. to Univ.'s Mot. at 9-10. These cases, however, each involve one or more of the statutes expressly enumerated in § 2000d-7(a)(1), rather than the provision's residual clause.

or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction." *Id.* at 1170 (internal quotation marks omitted). Accordingly, "[e]ven assuming that a residual clause like the one in [§ 2000d-7(a)(1)] could constitute an unequivocal textual waiver," the Court determines that Plaintiff has not demonstrated that the University has waived its Eleventh Amendment immunity in this matter. *Sossamon*, 563 U.S. at 292 ("A waiver of sovereign immunity must be strictly construed, in terms of its scope, in favor of the sovereign." (internal quotation marks omitted)). Plaintiff's claims against the University are, therefore, subject to dismissal.

II.   *Claims Against the Individual Defendants in Their Official Capacities*

A. Plaintiff's Claims for Damages

Plaintiff states in her pleading that the Individual Defendants "are sued in their individual, or alternatively, in their official capacities." Compl. ¶ 8. The Eleventh Amendment "bar remains in effect when State officials are sued for damages in their official capacity." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Plaintiff concedes this point. *See* Pl.'s Resp. to Indiv. Defs.' Mot. (Doc. No. 30) at 4. Thus, Plaintiff's official-capacity claims for damages against the Individual Defendants shall be dismissed pursuant to Rule 12(b)(1).

B. Plaintiff's Claims for Injunctive Relief

Pursuant to *Ex parte Young*,[3] "a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of

---

[3] 209 U.S. 123 (1908).

federal law and the plaintiff seeks prospective relief." *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012). Plaintiff's remaining official-capacity claims, which seek injunctive relief based on ongoing violation of the FHA, fall within the *Ex parte Young* exception to Eleventh Amendment immunity. *See id.* at 1167-68.

The Individual Defendants argue, however, that these claims are subject to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Indiv. Defs.' Mot. (Doc. No. 8) at 9-10, 21; Compl. ¶¶ 60-66. In analyzing a request for dismissal under Rule 12(b)(6), the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). A complaint fails to state a claim on which relief may be granted when it lacks factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) ("[T]o withstand a motion to dismiss, a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face." (internal quotation marks omitted)). Bare legal conclusions in a complaint are not entitled to the assumption of truth; "they must be supported by factual allegations" to state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Court agrees with the Individuals Defendants that the Complaint fails to plausibly state a claim upon which such injunctive relief can be granted. First, Plaintiff's specific request refers only to the University and does not adequately state a plausible claim

9

for prospective relief as to any Individual Defendant.  *See* Compl. ¶ 66 ("[Plaintiff] is entitled to injunctive relief to prevent the University from persisting in their refusal to provide a reasonable accommodation to the Plaintiff and students who have similar disabilities.").  Second, Plaintiff is no longer a student at the University and, therefore, cannot establish that she is subject to "irreparable harm" due to an ongoing violation of the FHA.  *Prairie Band Potawatomie Nation*, 476 F.3d 818, 822 (10th Cir. 2007).  Finally, as discussed below, Plaintiff has failed to plausibly allege that the Individual Defendants violated Plaintiff's rights under the FHA.

Accordingly, these claims shall be dismissed as to the Individual Defendants.

III.    *Claims Against the Individual Defendants in Their Individual Capacities*

A. <u>Eleventh Amendment Immunity</u>

Citing *Cornforth v. University of Oklahoma Board of Regents*, 263 F.3d 1129 (10th Cir. 2001), the Individual Defendants contend that Eleventh Amendment immunity extends to the claims raised against them in their individual capacities.  *Cornforth* provides, in pertinent part,

> A suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally.  The Eleventh Amendment is not implicated in such suits because any award of damages will be satisfied from the individual's personal assets and will not be paid from the state treasury.  If the sovereign is obligated to pay any damage award entered against the state official, however, the Eleventh Amendment bars the suit.

*Cornforth*, 263 F.3d at 1133 (alteration, citation, and internal quotation marks omitted); *see also id.* (rejecting argument that the state's obligation to indemnify extends Eleventh Amendment immunity to a state official sued in his individual capacity).

The Individual Defendants first argue that "none of the alleged conduct is 'fairly attributable' to any individual outside of the scope of his respective duties as a University employee." Indiv. Defs.' Mot. at 20. Yet, the Individual Defendants cite no authority suggesting that "scope of employment" is determinative of whether conduct is "fairly attributable" to the individual or, stated differently, that wrongful acts must be committed "outside the scope of employment" to be "fairly attributable" to the individual as contemplated in Eleventh Amendment jurisprudence. Second, the Individual Defendants state that "none of the allegations give rise to a plausible claim for damages against any individual personally." *Id.* The jurisdictional question, however, is not whether an award for damages will be entered, but whether the "sovereign [would be] obligated to pay" if it were. *Cornforth*, 263 F.3d at 1133; *see Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 996 (10th Cir. 1993) ("The proper analysis focuses on whether the damage award would be paid *directly* by the state treasury, rather than indirectly through commingled state and local funds or state indemnification provisions."). Absent any allegation that an award to Plaintiff on these claims would be paid from the state treasury, the Court declines to dismiss the individual-capacity claims on this basis.

B. <u>Immunity Under the Oklahoma Governmental Tort Claims Act</u>

The Individual Defendants next argue that Plaintiff's claims against them are barred by the Oklahoma Governmental Tort Claims Act ("OGTCA"), Okla. Stat. tit. 51, §§ 151

et seq., because Plaintiff has failed to allege facts plausibly showing that Defendants were acting outside the scope of their employment when committing the alleged tortious conduct.  *See* Indiv. Defs.' Mot. at 21-25.

The OGTCA, which provides "the exclusive remedy for an injured plaintiff to recover against a governmental entity in tort" under Oklahoma law, generally immunizes individual state employees from liability for torts committed "within the scope of their employment."  *Tuffy's, Inc. v. City of Okla. City*, 212 P.3d 1158, 1163 (Okla. 2009); Okla. Stat. tit. 51, §§ 152.1(A), 153(A); *see Crouch v. Daley*, 581 F. App'x 701, 705 (10th Cir. 2014).  Under the OGTCA, the term "scope of employment" is defined to include "performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority."  Okla. Stat. tit. 51, § 152(12).  Thus, "[a]n act of the employee is not in the scope of employment if the employee acted maliciously or in bad faith."  *Pellegrino v. State ex rel. Cameron Univ.*, 63 P.3d 535, 537 (Okla. 2003).

"Except in cases where only one reasonable conclusion can be drawn, the question of whether an employee has acted within the scope of employment at any given time is a question for the trier of fact."  *Tuffy's, Inc.*, 212 P.3d at 1163; *accord Nail v. City of Henryetta*, 911 P.2d 914, 918 (Okla. 1996); *see also Pendergraft v. Bd. of Regents of Okla. Colls.*, No. CIV-18-793-D, 2019 WL 3806639, at *6 (W.D. Okla. Aug. 13, 2019) (noting that "while [the scope-of-employment] issue may be adjudicated upon consideration of a summary judgment motion, it cannot properly be determined in a motion to dismiss"

(internal quotation marks omitted)); *Tilghman v. Kirby*, No. CIV-13-73-D, 2013 WL 6092529, at *3 (W.D. Okla. Nov. 19, 2013) (same).

Having thoroughly reviewed the allegations raised against each Individual Defendant, and viewing all allegations and inferences in Plaintiff's favor, the Court finds that different conclusions could be drawn as to whether each Individual Defendant acted in good faith. *See Gowens v. Barstow*, 364 P.3d 644, 652 (Okla. 2015) (rejecting argument that "malice or bad faith can never be inferred from conduct exhibiting reckless disregard for the rights of others"). Accordingly, the Individual Defendants' request for dismissal based on OGTCA immunity is denied

C. Failure to State a Plausible Claim for Relief

Finally, the Individual Defendants contend that dismissal of the individual-capacity claims is required under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. *See* Indiv. Defs.' Mot. at 25-42.

1. *Fraud*

Fraud is a generic term with multiple meanings. *See Manokoune v. State Farm Mut. Auto. Ins. Co.*, 145 P.3d 1081, 1086-87 (Okla. 2006). At various times in her Complaint, Plaintiff describes her claims of fraud as fraud in the inducement, actual fraud, and constructive fraud. *See* Compl. at 22-24. "Fraud in the inducement is defined as a misrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken." *Harkrider v. Posey*, 24 P.3d 821, 827 (Okla. 2000). Actual fraud is "the intentional

13

misrepresentation or concealment of a material fact which substantially affects another person." *Manokoune*, 145 P.3d at 1086 (internal quotation marks omitted). Constructive fraud is "any breach of a duty which gains an advantage for the actor by misleading another to his prejudice." *Id.* at 1087 (omission and internal quotation marks omitted). Unlike actual fraud, constructive fraud "does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose." *Id.* at 1086-87 (internal quotation marks omitted).

The Individual Defendants argue that Plaintiff failed to meet the pleading standard for claims of fraud under Rule 9(b) of the Federal Rules of Civil Procedure, which provides that, "[i]n alleging fraud of mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see* Indiv. Defs.' Mot. at 10-11, 27-30. To satisfy this standard, the complaint must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (internal quotation marks omitted).

Plaintiff predicates her fraud claims on allegations that "[s]he was repeatedly assured by the University that it prioritized student safety on campus above all else," that the Individual Defendants "failed to effectively disclose" that Plaintiff's dormitory "was unsafe for its students due to mold infestation," and that the Individual Defendants "failed to disclose the known dangers associated with exposure to mold, suppressed the dissemination of information about the existing dangerous conditions and risks associated therewith, and failed to effectively remediate the moldy conditions." Compl. ¶ 57. But as

14

to the time or place of any false representation or omission, Plaintiff's allegations are so general as to be conclusory. And Plaintiff altogether fails to associate specific Individual Defendants with specific false representations or concealments. *See Koch*, 203 F.3d at 1237 (noting that the identification of the "specific Defendant who made [the] alleged fraudulent misrepresentations or omissions" was "a particularly important requirement in [the] case because of the number of individual defendants involved").

Relevant allegations in other sections of the Complaint, which were incorporated into Plaintiff's fraud claims by reference, do not rectify this lack of specificity. Allegations specific to Defendant Brown provide that he "intentionally failed to warn occupants of the University dormitories, including the Plaintiff, regarding the health hazards associated with the mold that infected those dormitories." Compl. ¶ 33. Allegations specific to Defendant Gallogly similarly provide that he "failed to proactively notify incoming students" or "warn freshman dormitory students" of the existing mold and related health hazards. *Id.* ¶ 34. As to Defendant Surratt, Plaintiff broadly alleges that he "refused to proactively notify parents of incoming freshman students and/or the students themselves, including the Plaintiff, of the known health hazards associated with the mold," and "intentionally misl[e]d students and their parents concerned about the toxic mold, representing that student illnesses were not related to the mold in the University dormitories despite years of evidence to the contrary." *Id.* ¶ 35. Finally, allegations specific to Defendant Rowe provide only that he "intentionally caused information to be released that was designed to mislead students, and parents of students, who had been complaining of illness or health concerns related to mold that existed in the University dormitories." *Id.* ¶ 36. These allegations fail to inform the

Court or the Individual Defendants of the specific times, places, and methods of the alleged misstatements or concealments, and are therefore insufficient under Rule 9(b). *See P.R. v. Zavaras*, 49 F. App'x 836, 840 (10th Cir. 2002) ("Plaintiffs' broad allegations that each defendant 'deliberately withheld' and 'concealed' information from 1995 until 2000 [regarding investigations into previous improprieties], without any particular details regarding time, place, method or content of the alleged fraudulent concealment, fall short of the requirement that the circumstances in all averments of fraud be pled with particularity.").

As to Defendant Annis, Plaintiff alleges that she posted "an ineffective, difficult to find" notice on the University's Food and Housing website on September 20, 2018, that spoke of the University's challenges with mold and mildew in the dormitories and asked students to call maintenance to have the mold cleaned. Compl. ¶ 22. Plaintiff alleges that this notice was insufficient because it failed to state that some of the mold species were toxic, "failed to note any potential health or safety issues related to toxic mold," and "failed to emphasize urgency." *Id.* ¶¶ 22, 37, 41. Plaintiff further contends that the notice "falsely represented that the University's current challenges with mold and mildew in the University towers were related to the higher than usual rain and humidity in the fall of 2018." *Id.* ¶ 43(b). These allegations are sufficient to plausibly plead, with particularity, the concealment of material fact and inclusion of misleading information within the notice. But Plaintiff does not allege that she had read or otherwise relied on the notice. *Cf. id.* ¶ 22 (alleging that the notice "was not sent to students or parents of students living in the University dorms"). As such, her allegations do not plausibly reflect that Defendant Annis

breached any duty "by misleading [Plaintiff] to [her] prejudice." *Manokoune*, 145 P.3d at 1087.

These claims therefore must be dismissed pursuant to Rules 9(b) and 12(b)(6).

### 2.    *Fair Housing Act*

Disability discrimination under the FHA "may take several forms," including as applicable here "'a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.'" *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1275 (10th Cir. 2001) (quoting 42 U.S.C. § 3604(f)(3)(B)).   In her pleading, Plaintiff appears to allege that she was "handicapped" within the meaning of the FHA due to her heightened "susceptibility to toxic mold." Compl. ¶ 64.  Plaintiff further alleges that her "parents met with University officials and requested professional remediation of the elevated levels of toxic mold as a reasonable accommodation of the Plaintiff's obvious sensitivity to toxic mold" but that "University officials declined to undertake the requested remediation." *Id.* ¶ 63.

The Individual Defendants, through incorporation of the University's Motion, argue that Plaintiff has failed to plausibly allege that they refused her requested accommodation. *See* Indiv. Defs.' Mot. at 41 n.7; Univ.'s Mot. at 29-32.  The relevant allegations provide that on October 29, 2018, Plaintiff's mother "requested that the Plaintiff's dorm room and bathroom be tested for mold."  Compl. ¶ 43(c).  "The presence of mold was visually confirmed by Defendant Brown shortly after the October 29, 2018, meeting."  *Id.* ¶ 43(d).  "On October 30, 2018, the Plaintiff and her mother arrived at the Plaintiff's dorm room

and noticed that University personnel had used bleach on the walls." *Id.* ¶ 43(f). "On November 2, 2018, at the insistence of the Plaintiff's parents to have mold testing performed, the University agreed to complete a 'limited indoor air quality assessment' on the Plaintiff's dorm room, the adjoining bathroom, and the 6E Common Area." *Id.* ¶ 43(k). On November 1 or 4, 2018, Plaintiff withdrew her enrollment in the University. *Id.* ¶ 43(*l*).[4]

The Court agrees with Defendants that the element of refusal has not been plausibly pled. The failure to fully test and remediate mold within at most two or three days of such a request does not, by itself, constitute a refusal to do so. To the contrary, the facts alleged demonstrate that efforts to remediate the mold began one day after Plaintiff tendered her request that the premises be tested and testing was agreed to shortly thereafter. *See Arnal v. Aspen View Condo. Ass'n, Inc.*, 226 F. Supp. 3d 1177, 1186 (D. Colo. 2016) ("The duty to make a reasonable accommodation does not simply arise from the fact that the handicapped person wants such an accommodation made. Defendants must instead have been given an opportunity to make a final decision with respect to Plaintiff's request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law." (citation omitted)). Further, none of Plaintiff's allegations, including Plaintiff's conclusory

---

[4] As noted above, Plaintiff's pleading is not consistent as to the date of withdrawal. In the Complaint itself, she states she withdrew from the University on November 4, 2018. Compl. ¶ 43(l). In the Notice of Claim attached as an exhibit to the Complaint, she states that she withdrew from the University on November 1, 2018. *See* Notice of Claim at 3. Plaintiff affirms the November 1st date in her briefing. Pl.'s Resp. to Univ.'s Mot. at 31 n.7.

statement that "University officials declined to undertake the requested remediation," identify a refusal to accommodate by a specific Individual Defendant.  Compl. ¶ 63.

Accordingly, the individual-capacity claims brought under the FHA are subject to dismissal.

### 3.  Intentional Infliction of Emotional Distress

The tort of intentional infliction of emotional distress is governed by "narrow standards." *Comput. Publ'ns Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002).  To prevail, a plaintiff must establish that the defendant "intentionally or recklessly" engaged in "extreme and outrageous" conduct that caused the plaintiff to suffer "severe" emotional distress.  *Id.*  The plaintiff must prove that (1) the "defendant's conduct was so outrageous in character and so extreme in degree" that it went "beyond all possible bounds of decency" and "is regarded as atrocious and utterly intolerable in a civilized community," and (2) the plaintiff's resulting emotional distress "was so severe that no reasonable person could be expected to endure it."  *Id.* at 735, 736 (alteration and internal quotation marks omitted).  "Where, under the facts before the court, reasonable persons may differ, it is for the jury . . . to determine whether the conduct in any given case has been significantly extreme and outrageous to result in liability."  *Id.* at 735 (internal quotation marks omitted).

Applying these principles to Plaintiff's allegations, and viewing those allegations in the light most favorable to her, the Court concludes that the conduct alleged falls short of the type of "extreme and outrageous" conduct actionable under Oklahoma law.  While Plaintiff's allegations would establish a reckless at best—or intentional and knowing at worst—decision to allow students to be exposed to a mold infestation for which Plaintiff

was especially susceptible to harm, such conduct cannot reasonably be construed as "beyond all possible bounds of decency" and "atrocious and utterly intolerable in a civilized community." *Id*. at 735-36.

### 4. Public and Private Nuisance

Plaintiff raises both private nuisance and public nuisance claims against the Individual Defendants. Under Oklahoma law, as relevant here, "[a] nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either" "[a]nnoys, injures or endangers the comfort, repose, health, or safety of others," "[o]ffends decency," or "[i]n any way renders other persons insecure in life, or in the use of property." Okla. Stat. tit. 50, § 1. Oklahoma statute "encompasses the common law's private and public nuisance concepts"; "[c]ommon-law nuisance—a field of tort-like liability which allows recovery of damages for wrongful interference with the use or enjoyment of rights or interests in land—affords the means of recovery for damage incidental to the land possessor's person or chattel." *Nichols v. Mid-Continent Pipe Line Co.*, 933 P.2d 272, 276 (Okla. 1996) (emphasis and footnote omitted).

A public nuisance is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal." Okla. Stat. tit. 50, § 2. An individual "may maintain an action for a public nuisance if it is specially injurious to himself but not otherwise." *Id.* § 10. A "special injury" is an injury "different in kind, not merely degree, from that suffered by the general public from the act complained of."

*McKay v. City of Enid*, 109 P. 520, 522 (Okla. 1910). "A private nuisance is "[e]very nuisance not included in the definition of" a public nuisance. *Id.* § 3.

Plaintiff alleges that the Individual Defendants each had a duty to adequately warn of or remediate the toxic mold in her dormitory and that their failure to do so resulted in annoyance and injuries to herself and other student occupants, evidenced by multiple student complaints. Compl. ¶¶ 12, 16-19, 22, 29, 74. Plaintiff also alleges that the "toxic conditions . . . pose a substantial and sinister health risk to the students who occupy the living units in that building." *Id.* ¶ 74. Consistent with a claim for public nuisance, Plaintiff alleges that the toxic mold was pervasive throughout the dormitory, not just her dorm room, and that the smell and related illnesses affected a considerable number of students living in the dormitory. *See id.* ¶¶ 12, 16-19, 22, 29, 74. Plaintiff further contends that the toxic conditions were "especially injurious to [her]" in that she suffered permanent physical, psychological, and cognitive damage in the multiple forms listed in her Complaint. *Id.* ¶¶ 13, 44-46, 74.

The Court determines that these allegations are sufficient to plead a public nuisance "specially injurious" to Plaintiff. *See* Okla. Stat. tit. 50, §§ 2, 10; *McKay*, 109 P. at 522; *see also* 58 Am. Jur. 2d *Nuisances* § 210 ("Injuries to a person's health are by their nature special and peculiar for the purposes of maintaining [an action for public nuisance]."); Restatement (Second) of Torts § 821C(d) ("When the public nuisance causes personal injury to the plaintiff . . . , the harm is normally different in kind from that suffered by other members of the public and the tort action may be maintained.").

Though Plaintiff's Complaint contains a separate claim for private nuisance, the substance of the section speaks only of public nuisance. *See* Compl. ¶¶ 79-83. Indeed, the Complaint contains no allegations suggesting that the alleged nuisance falls outside the definition of public nuisance in title 50, section 2 of the Oklahoma Statutes. Accordingly, Plaintiff has failed to state a plausible claim for relief under a private nuisance theory. *See* Okla. Stat. tit. 50, § 10.

### 5. *Intentional Interference with Contract*

To establish a claim for tortious interference with contract under Oklahoma law, Plaintiff must prove that "(1) the interference was with an existing contractual . . . right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage." *Wilspec Techs., Inc. v. DunAn Holding Grp., Co.*, 204 P.3d 69, 74 (Okla. 2009). "A cause of action for wrongful interference with contract can arise only when one who is not a party to a contract interferes with that contract by convincing one of the contracting parties to breach its terms." *Ray v. Am. Nat'l Bank & Tr. Co. of Sapulpa*, 894 P.2d 1056, 1060 (Okla. 1994).

In support of the first element, Plaintiff alleges that she "had a contractual relationship with the University in 2018." Compl. ¶ 85. Plaintiff points to a Housing and Food Services Contract that she "was required to sign" that "set[s] forth the terms and conditions of the Plaintiff's occupancy of the Dormitory." Compl. ¶ 15; *see also id.* ¶¶ 54-55; Pl.'s Resp. to Univ.'s Mot. at 33. Plaintiff does not identify any express provision of the Housing and Food Services Contract that was breached by the University; rather, she argues that there was "an implied contract and an implied warranty of habitability on the

22

basis that University policies, rules, and regulations strongly weigh in favor of a safe dormitory." Pl.'s Resp. to Univ.'s Mot. at 33.

The parties agree that the Oklahoma Supreme Court has not addressed "the issue of whether an implied contract exists between a university and its student." *Clifton-Davis v. State*, 930 P.2d 833, 835 (Okla. Civ. App. 1996); *see Mason v. State ex rel. Bd. of Regents of Univ. of Okla.*, 23 P.3d 964, 970 (Okla. Civ. App. 2001); *Heldman v. Oklahoma*, 415 F. Supp. 3d 1012, 1020 (W.D. Okla. 2019); Univ.'s Mot. at 33; Pl.'s Resp. to Univ.'s Mot. at 33. Instructive on the general requirements for and limitations of an implied contract, though, is the Oklahoma Supreme Court's decision in *Russell v. Board of County Commissioners*, 952 P.2d 492 (Okla. 1997). In that case, the Oklahoma Supreme Court discussed the parameters by which "an employee handbook may form the basis of an implied contract between an employer and its employees." *Russell*, 952 P.2d at 501. In addition to the traditional contract requirements of competent parties, consent, a legal object, and consideration, the *Russell* Court identified two limitations on the scope of "implied contracts *via* an employee handbook." *Id.* at 502. One such limitation was that "the promises in the employee manual must be in definite terms, not in the form of vague assurances." *Id.* (footnote omitted). The *Russell* Court further explained that, "[a]lthough the existence of an implied contract generally presents an issue of fact, if the alleged promises are nothing more than vague assurances the issue can be decided as a matter of law." *Id.*

This Court assumes, for the limited purpose of deciding this Motion, that the Oklahoma Supreme Court would recognize in the Housing and Food Services Contract an

implicit warranty that any residence provided to Plaintiff will be free from dangerous levels of toxic mold.  To the extent that Plaintiff seeks to invoke some other implicit contractual obligation running from the University to her—such as that the University's "published policies make clear that [its] top priority 'is . . . students' safety and health'" and that it "strive[s] for a 'welcoming and safe environment,'" Compl. ¶ 15; *see id.* ¶ 43(a)—the statements she cites constitute mere "vague assurances" rather than "definite terms" and would not be cognizable under *Russell*.

The Individual Defendants argue that they, as agents of the University, cannot be held liable for interfering with a contract between Plaintiff and the University.  This is the general rule.  *See Wilspec*, 204 P. 3d at 74.  In response, Plaintiff contends that the bad faith of the Individual Defendants places her claims within an exception recognized in *Martin v. Johnson*, 975 P.2d 889, 896 (Okla. 1998).  A judge of this Court has previously addressed the scope of the *Martin* exception, explaining that bad faith alone is not sufficient to invoke it:

> There is an exception to the rule which applies if the agent was acting against the interest of the principal and in furtherance of the interests of the agent. As stated in *Martin*, in prior cases . . . the [Oklahoma Supreme] Court had not addressed "whether an agent could be held personally liable on an interference with contract claim if the agent was acting against the interests of the principal and in furtherance of interests of the agent." *Martin* addressed that issue, stating that "If an employee acts in bad faith and contrary to the interests of the employer in tampering with a third party's contract with the employer we can divine no reason that the employee should be exempt from a tort claim for interference with contract." *Martin* cited a number of cases from other jurisdictions which agree with it on this point. Among those cases, several emphasize that for liability to exist in this situation, the agent must have acted in his own personal interest rather than in the interests (or perceived interests) of his employer.

\*\*\*

This discussion in *Martin* makes clear that for the exception to the general rule to apply with the result that the tortious interference claim alleged in this action survives, the agent accused of tortious interference must have acted against the interest of the principle and in furtherance of the agent's own, personal interest.  Moreover, to show that the agent was acting in his own interests requires more than a showing of bad faith; plaintiff must show that the agent was acting contrary to the business interest of his employer and in furtherance of the agent's own, personal interests.

*Grillot v. Oklahoma ex rel. University of Oklahoma Board of Regents*, No. 19-241, 2019 WL 3558183 (W.D. Okla. Aug. 5, 2019), at \*3-4 (Friot, J.).

The Court agrees with this explanation.  Because Plaintiff has not alleged any facts that would show that, in interfering with the University's implied obligation to provide a residence free from dangerous levels of toxic mold, an Individual Defendant acted to further a personal interest rather than the University's interest, Plaintiff's claims of tortious interference with contract fail as a matter of law.  The Court dismisses the interference claims pursuant to Rule 12(b)(6).

## CONCLUSION

For the reasons detailed above, the Motion to Dismiss of Defendant State of Oklahoma *ex rel.* University of Oklahoma (Doc. No. 10) is GRANTED, and the Motion to Dismiss of Defendants Annis, Brown, Surratt, Rowe, and Gallogly (Doc. No. 8) is GRANTED IN PART and DENIED IN PART.  All claims against the University and all claims against the Individual Defendants are dismissed without prejudice, with the exception of Plaintiff's claim of public nuisance raised against the Individual Defendants in their individual capacities.

IT IS SO ORDERED this 31st day of March, 2021.

CHARLES B. GOODWIN
United States District Judge